**OTERO et al., Plaintiffs,**

v.

**NEW YORK CITY HOUSING AUTHORITY et al., Defendants.**

**No. 72 Civ. 1733.**

United States District Court,
S. D. New York.

May 23, 1972.

---

MAFY Legal Services, Inc., New York City, for plaintiffs; Nancy E. LeBlanc, New York City, of counsel.

Otto M. Bonaparte, New York City, for defendants; Jeanne Hollingsworth, Raphael Samuel, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

With decent public housing in woefully short supply, the struggle to allocate it fairly can be agonizing. This case presents a relatively small incident—but a vital one for the participants—in that struggle. It appears that defendant City officials, though apparently not from evil motives, have fueled fires of racial competition by lapsing into a rare departure from what all here agree is their usual stance of neutrality in matters of race and creed. Specifically, it appears that the City defendants are, in the peculiar circumstances of this case, effecting a discrimination adverse to non-white applicants for public housing by allowing two unlawful factors to affect the granting of applications:

(1) a refusal, evidently stemming from a legal error, to follow the command of their own regulation (and the official promise) to give first priority to former site residents; and

(2) a preference given to Jews—and, thus, an obstacle interposed against others—because the dwellings in question are convenient to an old and historic synagogue.

The plaintiffs, suing for themselves and a proposed class of "Black and Puerto Rican and other non-white families," charge that they are being discriminatorily denied access to low-cost public housing. They move now for a preliminary injunction and other threshold relief. The substantially undisputed

facts, and the reasons upon which this court will award the injunctive relief plaintiffs seek, are as follows:

### I.

The Seward Park Extension Urban Renewal Area is a federally-assisted urban renewal project on the lower east side of Manhattan. Undertaken pursuant to the Housing Act of 1949, as amended, 42 U.S.C. § 1450 et seq., the project has been under the prime responsibility of the New York City Housing and Development Administration (HDA).

The project involved the usual work of demolishing slum residences and the problem of relocating the people who lived there. The residents displaced in the process were variously relocated, many in public housing accommodations, under federal and local statutory policies contemplating such measures. Thus, the controlling federal statute, 42 U.S.C. § 1455(c) (1), concerned with this problem, requires that there be included in programs of this kind "a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and [that] there are or are being provided, in the urban renewal area or in other areas not generally less desirable * * * dwellings * * * available to such displaced individuals and families * * *." [1]

The families thus relocated were in all cases given explicit assurances by HDA officials that they would be entitled as former "site residents" to top priority in public housing to be erected in the urban renewal area. The promise was given to all—those whose "temporary relocation" was to public housing (whether in the neighborhood or, in many cases, to relatively distant places, including other boroughs of the City), as well as those moved to non-public housing. This promise reflected clear and unambiguous policies of the New York City Housing Authority (later to become the builder and landlord of the dwellings here involved, and a defendant herein) in its closely related and correlative Regulations declaring the priorities for admission to public housing.

In its codified concern for displaced site residents, defendant Housing Authority was in turn following and reflecting a governing federal policy. Thus, under 42 U.S.C. § 1410(g) (2), a portion of the Housing Act of 1937, as amended, which applies to the project before us, this defendant was required to "adopt and promulgate regulations establishing admission policies which shall give full consideration to its responsibility for the rehousing of displaced families" and of other classes enumerated thereafter. Though they are listed first, "displaced families" are not inevitably required to have a first priority under this federal mandate. On the other hand, it is perfectly consistent for the local housing agency to accord such a first priority, and the New York Authority did so.

The portion of defendant Housing Authority's Regulations governing "Priority in Selection" is set out in full as an Appendix to this opinion. As will be seen there, the highest priority is given to

"site residents of the site upon which the project was built, and if the project is within an urban renewal area, model city area, or other redevelopment area, site residents of sites acquired to effectuate the plan for such area * * *."

No exceptions were indicated, here or elsewhere, for "site residents" who might be in public housing at any other site as a matter of "temporary relocation." Other categories—including people needing "temporary relocation" from other sites, people living in substandard conditions, etc.—were given lower priorities, so that the inescapable result of the top priority given site residents would

---

1. Quoting from the cited provision for "temporary relocation" (which words he does not underscore), the Regional Administrator underscores the words "in the urban renewal area or in other areas not generally less desirable". As will appear, this misplaced emphasis is not helpful for the problem in this case.

have to be some substantial amount of inter-project transfers to fulfill the promise of return to the familiar neighborhood.[2]

In the fullness of time the defendant New York City Housing Authority took over the necessary land within the urban renewal area and erected as a federally-assisted public housing project the two buildings of concern in this case. The buildings, now almost ready for occupancy, contain a total of 360 apartments of various sizes. Arrangements for the receipt and processing of applications began in or around January of this year. In that month, in evident fidelity to the Regulations and explicit promises to former site occupants, the HDA sent a notice addressed "To present and former site tenants of Seward Park Extension." The notice said:

> "This is to notify you that all present and former residential tenants of Seward Park Extension will be given first priority to return to any housing built within this urban renewal area provided they meet certain qualifications."

The "qualifications" then specified related to income, family size and the like. The notice said further:

> "Persons who already live in public housing must apply for a transfer at the management office of their present project and advise this field office at 376 Grand Street of their intention."

The foregoing notice, as its text reflects, went to "all present and former residential tenants," whether residing now in public or private housing. There was no suggestion that the reaffirmation of "first priority" was inapplicable for the many recipients in public housing away from the Seward Park Extension site. Now, however, it is undisputed that this qualification, without notice of any kind to those affected by it, was actually imposed in processing the applications. The fact of this uncommunicated restriction, and the supposed justifications for it, were made known to plaintiffs only after the bringing of this action.

What happened was this: After receiving the notice recalling their "first priority" and making application, many of the former site residents, including most of the 50 named plaintiffs herein, either received no response or were told upon inquiry that all the apartments were filled. It became evident after a while that large numbers of applicants without the supposed "first priority" were obtaining apartments while people like these plaintiffs were not. It also developed that non-whites (meaning in this case mainly Puerto Ricans, but also some Blacks and Orientals) were being accepted in drastically lower proportions than they comprised in the class of first-priority site or former site residents. Most of the plaintiffs were driven to the plausible inference that they were victims of racial discrimination. The lawsuit followed.

As the court proceedings have exposed the facts more fully, it develops that the case is not one of racial hostility against plaintiffs and their class, but that the effects of deliberate distinctions made by the City defendants have included an inevitable pattern of racial discrimination forbidden by the Constitution and laws of the United States.

With respect to 161 of the new apartments the site-resident priority has been honored, and there is no dispute about these. Two apartments are for resident employees, and plaintiffs appear not to question this. This leaves a balance of 197 (including 26 not yet rented) affected by the issues in this case. And these issues, leaving aside some incidental things that are neither clear nor important in the present posture of the case,

---

2. Thus, for example, Family A, displaced from the lower east side "site" to public housing in Brooklyn, would take precedence over Family B, living in "grossly overcrowded conditions" (priority no. 4), but not having a "site" claim. Family A would take precedence in the "site." It would be entitled to transfer from the Brooklyn dwelling, to which Family B might then be admitted.

arise from two judgments upon which the City Housing Authority has proceeded in processing applications for the disputed apartments:

(1) That former site residents living in public housing outside the urban renewal area in question have no "first priority," and, indeed, no priority at all based upon their former residency.

(2) That because there is an old and landmark synagogue across the street from one of the two buildings, the Authority, "in the exercise of administrative discretion," may give preference to persons of the Jewish faith desiring "to be near this house of worship"—a preference which has resulted already in the rental of 48 apartments to Jewish families transferred from other public housing but lacking any claim to priority as former site residents.

Both of these judgments are assailed by the plaintiffs. That the Housing Authority is acting upon them—and that they have had overwhelming significance in allocating the apartments in question—seems to be undisputed, and is, in any case, indisputable. While pertinent computations cannot be made to decimal points, there are figures before us that give some sense of the powerful impact upon racial composition accomplished by the criteria defendants have followed. It appears that there were 1852 families qualifying as "site residents" when the urban renewal project began. Their racial composition was approximately 40% white and 60% non-white (as herein defined).[3] In contrast to those figures, out of 334 apartments thus far rented in the new project, 215 have gone to whites and 119 to non-whites, or about 64% and 36% respectively. And this reversal of figures does not tell the whole story. As has been mentioned, 161 of the apartments rented have gone to site residents, so that the earlier preponderance of non-whites may well continue in these. If so, the apartments involved in this case may be skewed still more heavily in favor of whites.

But the numbers are not, in any event, the nub of the problem. That whites have received numerically favored treatment in fact is not disputed. That this has resulted from the two criteria in issue is plain. If, as the court holds, these criteria could not lawfully enter into (and, more accurately, pervade) the administrative allocations of apartments, the determinations thus infected must fall. We proceed then to the legal analysis leading, in the judgment of this court, to that result.[4]

---

3. The definition is the subject of some disputation between the parties which is of no consequence for our purposes. Plaintiffs, who have an entire right to do this, define "non-white" to include Puerto Ricans, who actually comprise the bulk of those suing. The unlovely subject of racial definitions includes classifications different from this one. Nevertheless, as the facts in the case make clear, the discrimination against which plaintiffs complain has an impact upon Puerto Ricans, among others. Moreover, as will appear later, the definition the court is likely to adopt of the "class" bringing the action renders this topic academic.

4. Preliminarily, in brief deference to lawyers' logic, the court notes the array of jurisdictional grounds invoked by the plaintiffs. 28 U.S.C. §§ 1343(3) and (4), 1331, 1361, and 2201, and 42 U.S.C. §§ 1981–1983, 2000d, and 3612. The alternative and cumulative sufficiency of these statutes to supply jurisdiction in the strict sense is not questioned or questionable. There is a claim by defendant Housing Authority that the case is one for abstention either as a matter of general doctrine or under 42 U.S.C. § 3610 (d). The claim must fail, however. This case is not within stringent limits upon abstention in federal actions to enforce federal civil rights. Holmes v. New York City Housing Authority, 398 F.2d 262, 265–266 (2d Cir. 1968). Defendant Housing Authority's reliance upon 42 U.S.C. § 3610(d) is misplaced. Johnson v. Decker, 333 F.Supp. 88 (N.D.Cal. 1971); Brown v. Lo Duca, 307 F.Supp. 102 (E.D.Wis.1969). Insofar as the subject lies in discretion, cf. Colon v. Tompkins Square Neighbors, Inc., 289 F.Supp.

## II.

The broad denial of their first priority to former site residents who were temporarily relocated in public housing elsewhere is a violation of defendant Housing Authority's clear, explicit and unqualified Regulation. No one doubts that the Regulation has the force of law. And it is clear by now that an agency may not breach the promise of its own regulations and defeat the reliance of people upon such a promise.[5]

This would be true apart from the fact that the promise was affirmed when plaintiffs and others like them moved from the renewal area. But the specific assurance then given underscores and aggravates the wrong of which plaintiffs complain. They were never told that acceptance of "temporary relocation" in public housing elsewhere would destroy their priority for return to the site later on. They were told just the opposite. The Government and its officials have a right to mark "square corners" for dealings with them. See Rock Island, Ark. & La. R. R. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920). The people are not to be betrayed in their expectation of reciprocal treatment. See Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Moser v. United States, 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951). Persons like the plaintiffs could have chosen to forego "temporary" public housing had they been told the price would be effective banishment from their old neighborhood. They had no occasion to weigh that possible course because they were led to understand no such difficult choice was necessary.

But it is enough to say that the choice defendants would impose with impossible retroactivity could not be lawfully required. There was and is nothing in the controlling regulations on priority to justify defendants' view that people temporarily relocated in public housing would thereby lose their first priority.

The City Housing Authority points to its separate publication on Inter-Project Transfers as a basis for claiming otherwise. Preliminarily, it is interesting to note that the court learned, following inquiry, that this publication "is not posted or circulated to tenants, but is for the guidance of project managers."[6] The Regulations, including the statement of Priority in Selection, on the other hand, are required to be posted for tenants in Authority buildings and were, obviously, the basis for the explicit assurances given to plaintiffs both when they were moved from the site and when they were invited years later to exercise their "first priority" and move back. It is strange and disheartening to be told that such published rules, addressed to their beneficiaries, may be amended drastically by directives kept secret until it is too late to matter.[7] Even if this were acceptable, however, the management's transfer rules do not, as a matter of construction, have the effect for which defendants argue. The reasons for transfer include "former site occupant." Not a word in the document purports to amend or limit the "first priority" such a former occupant has in the site to

---

104 (S.D.N.Y.1968), the emergent character of plaintiffs' claims and the restrictions upon class actions under the New York practice argue against the federal court's staying its hand.

5. See note 13, and text, *infra*.

6. Affidavit of Irving Wise, Director of Management of the New York City Housing Authority, sworn to May 19, 1972, par. 8.

7. The Affidavit cited in the preceding footnote goes on to say that the transfer regulations circulated only to managers may be disclosed to tenants at transfer time. "When a tenant comes to the management office requesting transfer to another project, at that point he should be advised by the manager as to whether or not his request is governed by one of the prescribed reasons, or by a reason which although not specified may be an acceptable basis for a transfer request." *Id.*

which he seeks transfer. Nothing in this separate, undisclosed paper begins to justify the alleged erasure of the priority on which defendants claim now to rely.[8]

The arguments of defendants on this subject do not become more convincing when they proceed to asserted grounds of logic and policy. They chide plaintiffs with this sort of self-defeating *reductio*:

> "Plaintiffs do not explain how 1,852 former site occupants of Seward Park Extension Urban Renewal Area are to be accommodated in the 360 available apartments of this particular project." [9]

Of course, plaintiffs have no such silly claim or burden. They merely argue, soundly, that the first priority may not be nullified and ignored for all of them (or, more correctly, the 600 or so families who appear to be affected) even though only some of them will enjoy the benefits of the priority.[10]

■ It is argued, on more cogent ground, that transfers among public housing projects entail burdens of trouble and expense. But this, if it is a legitimate basis for lawful changes in the announced priorities, is no basis for reneging on the assurances given by the regulations as they exist. The Government extends many benefits to the people, both rich and poor. Many of these benefits are costly, and troublesome to those who administer them. Whether as an absolute or relative matter, the expense of transfers is not an undue price to pay for keeping official promises and obeying the law, quite apart from the human values of neighborhood attachment to which many might assign some economic worth. Cf. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 930 (2d Cir. 1968).

Finally, if somewhat tardily, the Regional Administrator of the United States Department of Housing and Urban Development (HUD) filed an affidavit after argument opposing the position of plaintiffs. The auspices and authorship of this affidavit give it weight. But it is not intrinsically persuasive. As has been mentioned, the Regional Administrator relies upon federal provisions for "temporary relocation" which have only a diversionary effect here.[11] He manages to indite 21 paragraphs of presentation, extended over seven legal-sized pages, without citing or quoting the City Regulation plaintiffs invoke. He says (what is not disputed) that federal law does not in itself *require* first priority for former site residents. Then, toward the end, he quotes from the "declaration of national housing policy" in the Act of 1949, 42 U.S.C. § 1441, the objective of decent housing "for every American family" and of evolving measures to achieve that goal. He goes on to say that the national goal

> "is frustrated if persons who have been relocated to standard housing, that is housing which is decent, safe, and sanitary * * *, (1) are permitted to exercise a 'right of return' [a quaint expression for this case] to other standard housing units, over other individuals who are residing in housing

---

8. The textual analysis is more fully developed in the able submissions by plaintiffs' counsel. Having profited from that thorough demonstration, the court deems it unnecessary to retrace it for purposes of this opinion.

9. Affidavit of Housing Authority Chairman Simeon Golar, sworn May 16, 1972, p. 7.

10. On oral argument the promises of HDA at the time of temporary relocation were discounted on the ground that the Authority before us is a "separate agency." That separate agency, we note, sent out the notices in January 1972 inviting "first priority" applications. Anyhow, the argument is no stronger than it is edifying. The two agencies are essentially parts of the City Government, whatever their technical forms. They were tightly interrelated in the course of federally-assisted development of which the two buildings are part. And the priority regulations are, after all, those of the defendant Housing Authority.

11. See note 1, *supra*.

which is less than standard or whose particular personal situations, as determined on an individual basis, require that they be relocated to other housing facilities." [12]

But this, apart from its utter neglect of the Regulation in issue, is unsound. As has been observed (see note 2, *supra*), the first priority for former site residents does not bar another applicant for public housing altogether when an apartment at the site becomes available. If Family A (with a first priority) is in non-site Apartment 1 and exerts the priority over Apartment 2 (at the former residence site), then Apartment 1 becomes available for Family B. Whether or not Family A has top priority, there is only a single vacancy from the viewpoint of Family B. The question is simply which family has first claim to Apartment 2. And on that the City's Regulation speaks with absolute clarity. See Appendix, *infra*. On priorities for admission to a particular site, former residents come first; others, including those "in emergency need of housing," come later. It results that in the choice of *place* only, the value of neighborhood attachment is elevated, a perfectly sensible and commendably sensitive assessment. Nothing in that unmentioned and unanalyzed rationale conflicts with anything adduced by the Regional Administrator.

The short of this subject is that the Housing Authority, in dishonoring its own regulations and denying first

priority to plaintiffs and others in their class, has denied them the due process of law.[13] If the Housing Authority's course be deemed less than a constitutional violation, it is in any event a breach of legal duty correctible in this proceeding. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). Together with the other circumstances of the case, the error of the City's officials has resulted, foreseeably and directly, in a racially discriminatory pattern of admissions to the apartments in question. Plaintiffs and their class are thus denied the equal protection of the laws. The fact (which none dispute) that defendants are not balefully or invidiously motivated against non-whites in general does not alter this conclusion. See Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Norwalk CORE v. Norwalk Redevelopment Agency, *supra*, 395 F.2d at 931. In any event, the point becomes more sharply decisive because the wrongful denial of priority in this case supplies the opportunity for, and is linked with, the granting of religious (and, concomitantly, racial) preferences in the handling of applications. This conjoined wrong, to which we turn now, plays a substantial role in requiring the remedy to be ordered.

### III.

Presumably concerned for cultural and other values, the defendant Housing Authority has given a prefer-

12. Affidavit sworn to May 18, 1972, par. 18.

13. It is settled that an agency's departure from its own regulations may violate the due process protection. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); United States ex rel. Donham v. Resor, 436 F.2d 751, 754 (2d Cir. 1971). This does not mean that any deviation by administrators from their rules must be deemed an offense against the Constitution. But whatever limits and subtleties may attend the doctrine of the cited cases, their essential principles seem applicable here.

The breach of official promise and the disappointment of expectations generated by reliance upon such a promise are patent from the chronology of the case and the face of the priority regulations alone. Cf. United States v. Leahey, 434 F.2d 7, 11 (1st Cir. 1970). Beyond that, however, responsible officials personally buttressed the right to rely by direct assurances to the poor people, presumably unlearned in the law, who are plaintiffs before us. This occurred not only at the critical point of their displacement from the renewal area, but later again when applications were invited for the apartments from which plaintiffs are now being barred.

ence to Jews in large numbers because of the nearness of a desirable synagogue. It might conceivably be enough to say that the agency has no statutory authority to employ such a criterion and that a ground of selection so explosive in its implications may not be taken simply "in the exercise of administrative discretion," as Chairman Golar tells us has happened. It may be necessary also, however, and not amiss, for this federal court to declare that the allocation of scarce public housing upon such a basis is unconstitutional. It violates the Supremacy Clause because it offends against more than one controlling federal statute banning racial discrimination in federally assisted programs like the one before us. E. g., 42 U.S.C. §§ 2000d and 3604.[14] It violates the Equal Protection Clause. And it is forbidden by the Establishment of Religion Clause of the First Amendment as applied to the States through the Fourteenth.

■ However laudable their motives, the officials of the City Housing Authority have allowed themselves to employ a criterion of religious selection which the Constitution commands them to eschew. Even a legislative enactment of such a criterion would probably be invalid. For neither the Congress nor state legislatures "can pass laws which aid one religion, aid all religions, or prefer one religion over another." Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). The finding of unconstitutionality is more clearly compelled when there is not a word of statutory or other supposed support for a practice by which the City's officials make discretionary decisions designed precisely to "advance" religion by making convenience of worship a ground of preference.[15]

■ Plaintiffs argue, *inter alia*, that the east side area from which Jews are being transferred to be near the particular synagogue involved here contains a plenitude of other synagogues within walking distance of places from which the transferred families are to come. There is an appearance of factual basis for the contention. But it is a subject all of us ought to be avoiding rather than exploring. It invites the kind of "excessive government entanglement with religion," Walz v. Tax Commission, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L. Ed.2d 697 (1970), that the Religion Clauses were designed to prevent. The duty of the City Housing Authority is to consider applicants without regard to race, creed, color, or national origin. That duty is violated—and the command of the First Amendment is specifically transgressed—when administrators prefer one applicant over another because of religious faith and convenience of worship.[16]

14. The Regional Administrator of defendant HUD, while he sides with the Housing Authority as to the priority question, has not favored the court with any intimation of his Department's views on the preference now under consideration.

15. It is familiar law, of course, that a statute (and *a fortiori* an exercise of administrative discretion), to avoid the prohibitions of the First Amendment, must have as "its principal or primary effect * * * one that neither advances nor inhibits religion," Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

16. The defendant invokes Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed. 2d 965 (1963). That decision, under the Free Exercise Clause, marked part of the outer limits on state power to *deny* benefits to a religious communicant where "not only is it apparent that [the person's] declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable." P. 404, 83 S.Ct. p. 1794. It is a wholly different thing to *grant* benefits, sharply limited in supply, where the grantee inevitably excludes some other applicant and is preferred "for benefits * * * solely [for] the practice of * * * religion."

Thus, Mr. Justice Douglas wrote in his concurring opinion, the *Sherbert* case was

"resolvable not in terms of what an individual can demand of government, but solely in terms of what government may not do to an individual in violation of

## IV.

 The motion before the court seeks a determination under F.R.Civ.P. 23(c) that the suit may proceed as a class action. This application will be granted. However, in light of the court's other conclusions at this preliminary stage, it does not appear appropriate to define the class as broadly (or, in one aspect, as narrowly) as plaintiffs would have it.[17] The court will order, of course, the abandonment of the religious preference. With that removed, there remains as the only other identified wrong the failure to honor the first priority of former site occupants now in public housing elsewhere. To gear the class determination to the circumstances of the case, it seems sufficient to define the class as including all such people.

This may have the incidental convenience of simplifying problems of notice and other administrative details. It appears that all members of the class thus defined received notices honoring their first priority in January of this year, and that all whose rights we should be concerned about have presumably applied for apartments. It will perhaps be feasible, therefore, to define the class as this group of applicants.

In one respect, as has been mentioned, the court's proposed definition enlarges the class plaintiffs propose. Plaintiffs "are all Puerto Rican or other non-white" persons,[18] and they seek to represent "all similarly situated Black and Puerto Rican and other non-white families."[19] The court's tentative definition would include white people with first priority as well. Subject to further exploration, and considering the nature of the legal representation plaintiffs enjoy, this suggests itself as a just and workable modification.[20]

To make more explicit what should be apparent already, these observations on the Rule 23 determination are necessarily "tentative" and "proposed" by the court. The subject has not been extensively briefed or argued. The main focus has been thus far on the more pressing subject of injunctive relief. The Rule itself, 23(c) (1), contemplates orders that "may be conditional, and may be altered or amended before the decision on the merits."

## V.

Returning to the problem of more immediate urgency, the granting of a preliminary injunction in this case is not necessarily a simple or self-evident resolution. It appears that June 1, 1972, is the scheduled date of occupancy for the apartments in controversy. Granting that such schedules are not uniformly met, it seems probable that injunctive relief will cause (1) delay in occupancy, (2) dislocation and distress to families whose granted applications may now be rejected, or at least granted only for different sites, and (3) loss of rental income to the Housing Authority. Despite these weighty concerns, the equitable scales fall solidly on plaintiffs' side. The Housing Authority has proceeded in violation of its obligations under its own regulations, federal statutory policies of the greatest moment, and the Federal

his religious scruples. The fact that government cannot exact from me a surrender of one iota of my religious scruples does not, of course, mean that I can demand of government a sum of money, the better to exercise them. For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Id.* at 412, 83 S.Ct. at 1798.

17. Without tracking all its details, plaintiffs' definition would embrace broadly non-white applicants who are, as well as many who are not, site occupants or former site occupants.

18. Complaint, pars. 3–5.

19. Id., par. 6.

20. Counsel for plaintiffs, a legal services agency, may be noticed by the court for its general concern with *poor* people in its geographical purview, not exclusively with non-whites, however disproportionately the latter contribute to the numbers of the disadvantaged.

Constitution. The resulting wrongs were effectively concealed from plaintiffs—and it does not matter for present purposes that the concealment probably resulted from neglectful unawareness rather than intentional deception. Plaintiffs acted promptly when the evidence of unlawful deprivations began to appear. The concrete dimensions of the violations became apparent only days ago, in the Housing Authority's presentations opposing the injunction.

 In all the circumstances, then, an injunction should and will issue. It seems evident that the relief ordered must as a basic item require consideration, with their highest priority, of all filed applications from site occupants and former site occupants. Secondly, these and other applications must be judged without reference to race or religion in any way. All must be ordered in terms of the neutral priorities and other criteria announced by the regulations.

The court is unable to know how speedily the remedy can be administered. It is impossible likewise to guess how many applications erroneously granted will be required now to be denied or granted elsewhere. Consideration should be given, of course, to whether the potential hardships under this decision may somehow be mitigated through adjustments or accommodations made possible by the Housing Authority's resources consistently with the paramount requirements of constitutional and statutory law.[21] The court, obedient to the dictates of equity and to its duties in class actions, will undertake to collaborate in, and accept responsibility for, any such measures.

Counsel should proceed speedily to settle an order (1) declaring this a class action and (2) enjoining defendant Housing Authority in accordance with this opinion.

---

21. The Housing Authority asks, knowing it is impossible, that plaintiffs be re-

## APPENDIX

(From N.Y.C. Housing Authority Regulations for Admission to Public Housing)

### PRIORITY IN SELECTION

The number of eligible applicants greatly exceeds the number of apartments. The Authority therefore has established an objective system, based upon urgency of housing need, for the selection of applicants for available apartments. Priority in assignment of apartments is given to eligible applicants in the following order:

1. site residents of the site upon which the project was built, and if the project is within an urban renewal area, model city area, or other redevelopment area, site residents of sites acquired to effectuate the plan for such area;

2. families in emergency need of housing, including families who are homeless, under order of eviction, living in buildings condemned as unfit for human habitation, living under housing conditions which because of illness or disease endanger life, or facing displacement from sites, buildings or dwelling units, being cleared or vacated by governmental action;

3. families residing under extremely substandard conditions, and severely handicapped persons who reside under conditions which create extreme hardship;

4. families residing under grossly overcrowded conditions;

5. families residing under conditions which create a health hardship for one or more persons;

6. families residing under other substandard or hardship conditions.

If the head of the household is a Vietnam veteran or serviceman, the family is considered for admission immediately following families in emergency need of housing, unless it qualifies for

---

quired to post a bond. The request is denied. See 42 U.S.C. § 3612.

a higher priority on the basis of housing need.

Where the applicant's housing need is of an emergent nature (categories 1, 2 and 3, above), preference in apartment assignment within each category is given first to applicants who have resided in the City for at least two years and then to those with less than two years residence. Where housing need is of a less urgent nature (categories 4, 5 and 6, above), applicants who have resided in the City for two years or more are assigned first. Assignment of families with less than two years residence follows such assignments in parallel order of priority.