**J. Michael FLANAGAN, Plaintiff,**

**v.**

**The PRESIDENT AND DIRECTORS OF GEORGETOWN COLLEGE et al.,**
**Defendants.**

**Civ. A. No. 75–1500.**

United States District Court,
District of Columbia.

July 28, 1976.

J. Michael Flanagan, pro se.

John Miles, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This is an action under Title VI, section 601 of the Civil Rights Act of 1964, 78 Stat. 241, 252, 42 U.S.C. § 2000d, alleging that defendants have discriminated against plaintiff on the basis of race in the allocation of financial aid to students at the Georgetown University Law Center. Plaintiff also bases this action on Sections 9.1 and 17.1 of the District of Columbia Human Rights Law, Title 34, D.C. Rules and Regu-

lations. Plaintiff seeks a permanent injunction against these alleged discriminatory actions and $3,700 in damages, representing the amount of financial aid plaintiff alleges he would have been awarded had he not been the subject of this alleged discrimination.

Plaintiff has moved for summary judgment. Defendants have opposed this motion, arguing that there are material issues of fact in dispute which preclude summary judgment and that as a matter of law plaintiff is not entitled to judgment. Upon consideration of the entire record herein and for the reasons to be detailed in this Memorandum, the Court concludes that plaintiff is entitled to a partial summary judgment on the question of liability but the determination of damages (if any) must await further action by the parties.

### I.

Plaintiff is a white (Caucasian) student, enrolled since September, 1973, at Georgetown University Law Center.[1] The defendants are (1) the President and Directors of Georgetown College (hereinafter Georgetown), an institution of higher learning chartered in the District of Columbia; (2) Robert S. Henle, S.J., President of Georgetown; (3) the Georgetown University Law Center (hereinafter Law Center), a division of Georgetown; (4) David J. McCarthy, Dean of the Law Center; and (5) David W. Wilmot, Chairman of the Law Center Committee on Financial Aid.[2]

Since 1967, the Law Center Committee on Admissions with the approval of the Law Center faculty has developed an Affirmative Action program in an effort to increase the enrollment at the Law Center of certain "minority" students.[3] Efforts were made to recruit potential "minority" students, and to develop proposals for financial assistance to "minority" students. By 1972, however, these efforts had achieved relatively little success. The Law Center's Ad Hoc Committee on Minority Affairs attributed this to the lack of financial assistance opportunities available to potential "minority" students. This Ad Hoc Committee presented certain proposals to the Law Center faculty in February, 1972. On February 24, 1972, the faculty passed a resolution which defendants summarize as follows:

> the Law Center Admissions Committee would consist of five faculty members and three students representing student groups known as La Raza, BALSA and the Student Bar Association; the Committee would, *inter alia*, in reviewing and passing upon applications for admission, give renewed consideration to those "minority" or "disadvantaged" persons not clearly acceptable based upon traditional admissions indices; *sixty percent (60%) of available scholarship funds for the freshman class in 1972 would go to such persons*; and the program would continue for three years.[4]

The scholarship funds that are made available 60% to "minority" students and 40% to "non-minority" students are funds that originate from Georgetown's own revenues, and are referred to as "Direct University Scholarships."[5] The term "minority" student as used by the Law Center in implementing these policies includes not only persons in discernible ethnic and racial groups (Black Americans, Native Americans, Asian Americans, Spanish-speaking Americans), but also applicants with social, educational, cultural, and/or financial disadvantages. The defendants assert, "[u]nder this minority definition applied by

---

1. Since the filing of this lawsuit and the oral argument on the pending motions, plaintiff has graduated from the Law Center. The case, however, is not moot, since plaintiff is seeking money damages, as well as injunctive relief.

2. The individual defendants are being sued in their official capacities, and their liability in this action is solely in their official capacities.

3. These facts concerning the Law Center's efforts to recruit "minority" students are taken from the affidavit of defendant Wilmot submitted by all defendants in opposing plaintiff's motion for summary judgment.

4. Wilmot affidavit at p. 3 (emphasis added).

5. These "scholarships" are actually a form of financial aid based on need.

the Office of Admissions, other ethnic or social groups, including whites or Caucasians, may qualify and have qualified for minority status."[6] Defendants further indicated that in plaintiff's first year class of 623 students there were 68 "minority" students, or less than 11%.

Within the two groups of first year students, "minority" and "non-minority," the scholarship funds are distributed on the basis of demonstrated financial need, as reflected in the standardized, confidential Graduate and Professional School Financial Aid Service (GAPSFAS) form submitted by all applicants to the Educational Testing Service (ETS) in Princeton, New Jersey. The information in this form is evaluated by ETS which submits to the Law Center a confidential "Summary of Applicant's Resources." Based on these documents the Law Center's Financial Aid Office makes an assessment of the applicant's financial aid need in light of tuition costs, expenses, and related considerations. In 1973, plaintiff's first year at the Law Center, this total cost was estimated to be $5,400 for a single, full-time student. From this figure an applicant's total assets are subtracted and a scholarship determination is made.

From data disclosed in discovery it appears that the amount of financial aid given is in direct relation to the financial need estimate. The table set out in the margin[7] was compiled by plaintiff in his affidavit from information supplied by the defendants in discovery. It contains information on plaintiff and those minority students whose financial need data was computed on the same ETS basis and who were awarded scholarships in the 1973–74 school year.

It is defendants' policy not to review an application for scholarship aid until a prospective student has been accepted for admission to the Law Center. If the accepted applicant demonstrates need, he or she is awarded a scholarship if Direct University Scholarship funds are available. Since admissions are made on a rolling basis, there is the possibility that if an applicant is admitted late in the process there may be no funds left to award that applicant a scholarship even if he or she has a demonstrated need. In plaintiff's case he was not accepted for admission for the academic year 1973–74 until June, 1973, by which time all Direct University Scholarship funds available for "non-minority" applicants had been exhausted.

The Direct University Scholarships funds available for "minority" students, however, were not exhausted. During the second semester of the 1973–74 academic year, the Financial Aid Committee reviewed the financial aid applications of many students, including plaintiff, and awarded plaintiff a scholarship of $400 for the second semester of that academic year.

## II.

Plaintiff has moved for summary judgment arguing that defendants' policies and actions as outlined above unlawfully discriminated against him in violation of Title VI

6. Wilmot affidavit at p. 4.

7.

| Student (Minorities identified by numbers) | ETS Financial Need Estimate | Direct University Scholarship Award |
|---|---|---|
| 6, 9, 11, 16, & 38 | $4800 | $2500 |
| 2 | 4785 | 2500 |
| 35 | 4775 | 2500 |
| 33 | 4760 | 2500 |
| 19 | 4741 | 2500 |
| 23 | 4670 | 2500 |
| 24 | 4600 | 2500 |
| 3 | 4530 | 2500 |
| 31 | 4420 | 2070 |
| 1 | 4300 | 2500 |
| 10 | 4220 | 2500 |
| 30 | 4010 | 2500 |
| 15 | 3800 | 2500 |
| 25 | 3580 | 1875 |
| 17 | 3510 | 2500 |
| 5 | 3380 | 2170 |
| 37 | 3200 | 700 |
| 14 | 3170 | 2170 |
| Plaintiff | 2700 | 400 |
| 12 | 2550 | 1885 |
| 26 | 2300 | 1825 |
| 28 | 2190 | 1895 |

of the 1964 Civil Rights Act.[8] Plaintiff has limited his motion to the alleged discrimination in his first year at the Law Center, as it appears that the "minority" student financial aid policies apply only to first-year students. Title VI provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

Plaintiff argues that by segregating first-year students into two classes on the basis of race and allocating scholarship funds so that 60% of the funds were made available to 11% of the first-year students and 40% to the remaining 89% of the first-year class, defendants violated this provision as well as the relevant regulations of the United States Department of Health, Education and Welfare (H.E.W.). These regulations are designed to implement Title VI as it relates to programs funded by H.E.W. The federal financial assistance plaintiff alleges defendants received includes federal grants, loans, and interest subsidies totalling over $7 million for the construction of the Law Center building under the Higher Education Facilities Act, Pub.L. 88–204, 77 Stat. 363 (repealed 1972), administered by H.E.W. Plaintiff alleges that defendants' actions are in violation of specific prohibitions in the H.E.W. regulations, as well as the general prohibition in the statute. Section 80.3(b)(1) of Title 45 C.F.R. provides:

A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin:

\* \* \* \* \* \*

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, finan-cial aid, or other benefit under the program;

\* \* \* \* \* \*

(v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program.

As direct evidence of the discriminatory effect of defendants' policies, plaintiff points to the documentary information supplied by defendants. The table in note 7 above, for example, indicates that plaintiff, with a financial need estimate of $2,700 received a $400 scholarship award, while three "minority" students with lesser financial need estimates of $2,550, $2,300 and $2,190, received respectively, $1,885, $1,825, and $1,895.

### III.

Defendants' opposition to plaintiff's motion is in four parts. First, it is argued that plaintiff has failed to demonstrate that the classification of first year students as either "minority" or "non-minority" is discrimination on the basis of race as prohibited by Title VI. Second, defendants assert that plaintiff has failed to demonstrate that (or at least there is a material issue of fact as to whether) the Law Center has received "substantial" federal financial assistance so as to bring the actions of defendants within the purview of Title VI. Third, defendants assert that their financial aid policies are part of a bona fide affirmative action program to increase minority enrollment at the Law Center and are therefore not in violation of Title VI. Alternatively, they argue that this issue is in dispute and can only be resolved at trial. Fourth, defendants assert that even assuming plaintiff was discriminated against, he was not damaged by such discrimination, and therefore lacking actual damages, plaintiff has not made out a case under Title VI. The Court will examine

---

**8.** As a consequence of the Court's finding liability under Title VI, it will not consider the question of liability under the District of Columbia Human Rights Law.

each of these bases for opposing summary judgment separately.

■ A. It is not disputed that the "minority" classification receiving 60% of the scholarship funds is the "favored" classification. Indeed the evidence, adduced in discovery and as summarized in note 7 above, clearly indicates this. The issue on discrimination then comes down to what persons are afforded "minority" status.

In paragraph 11 of plaintiff's Statement of Material Facts Not in Issue he asserts:

> For purposes of the [1972] faculty resolution, "Minority Students" includes Native-Americans (American Indians), Spanish-speaking Americans (Chicanos and Puerto Ricans), Afro-Americans, and Asian Americans. White (Caucasian) American students are excluded from the classification.

It is this classification on a racial [and national origin] basis that plaintiff alleges is discriminatory, and in violation of Title VI. Defendants argue, however, that there is nothing in the record to support this definition and it is specifically disputed in the affidavit of defendant Wilmot:

> For purposes of the said faculty policy guideline and the allocation of Direct University Scholarships, "minority" status includes not only discernible ethnic and racial groups (Black Americans, Native Americans, Asian Americans, Spanish-speaking Americans), but also applicants with social, educational, cultural and/or financial disadvantages. Under this minority definition applied by the Office of Admissions, other ethnic or racial groups, including whites or Caucasians, may qualify and have qualified for minority status.[9]

Unfortunately for defendants this definition of "minority" is equally susceptible to an allegation of improper discrimination. Certain ethnic and racial groups are automatically accorded "minority" status, while whites or Caucasians must make a particular showing in order to qualify. The fact that some whites or Caucasians have qualified for minority status does not lessen the discriminatory nature of the classification. Access to the "favored" category is made more difficult for one racial group than another. This in itself is discrimination as prohibited by Title VI as well as the Constitution.[10]

B. Title VI prohibits discrimination "under any program or activity receiving *Federal financial assistance*." Defendants assert that there has been no showing by plaintiff that Georgetown or the Law Center has received "substantial" federal financial assistance as related to the scholarship aid to which plaintiff claims he is entitled. Plaintiff has alleged that Georgetown received total federal benefits of over $7,000,000 for the construction of the Law Center building. This has not been denied by the defendants. They do argue, however, that these funds are unrelated to the scholarship funds. The monies for the University Direct Scholarships come solely from Georgetown's own funds. No federal monies are used. Therefore, the argument continues, there has been no discrimination in the use of federal funds, so as to bring the discrimination in the scholarship program within the purview of Title VI.

This argument has facial appeal as well as support in the recent case law. In *Stewart v. New York University*, No. 74 Civ. 4126 (S.D.N.Y. March 16, 1976), the plaintiff challenged a law school minority admissions program on the basis, *inter alia*, of a violation of Title VI. The court held that in order to state a claim under Title VI,

---

9. Wilmot affidavit at p. 4.

10. *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); and see *Frontiero v. Richardson*, 411 U.S. 677, 682, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), as to impermissible sex discrimination. Defendants' attempt to broaden the definition or classification of "minority" to include financially disadvantaged whites appears to contradict the statistics supplied, i. e., that 60% of available financial resources would go to "minorities." Thus, it would appear, if this classification were *actually* followed, there would be no basis on which the remaining 40% could be distributed to nonminorities.

plaintiff must show that the Federal financial assistance received by the Law School constitutes more than a *de minimus* portion of its annual revenues and that there is some material connection between said assistance and the minority admissions policy challenged herein.[11]

In dismissing plaintiff's Title VI claim, the court held, *inter alia,* that a $625,000 indebtedness to the United States Department of Housing and Urban Development for the construction of a law school dormitory was insufficient because the discrimination alleged did not involve the dormitory, but rather the minority admissions policy.

█ This "pin-point" approach is ostensibly based on § 602 of Title VI, 42 U.S.C. § 2000d–1, which provides that compliance with Title VI may be effected by the termination of such program or activity in which discrimination is found, but that such termination shall be

"limited to the particular political entity, or part thereof, or other recipient [of Federal financial assistance] as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found."*

42 U.S.C. § 2000d–1 (emphasis added). This provision of course is directed towards the efforts of federal agencies in effecting compliance with Title VI, and is not a restriction on the types of discrimination outlawed by the statute.

Furthermore, this same provision provides that each federal agency extending federal financial assistance is authorized to issue rules and regulations to implement the objectives of Title VI. H.E.W. is the federal agency which administered the Higher Education Facilities Act under which Georgetown received the Federal financial assistance for the construction of the Law Center building. The H.E.W. reg-

ulations effectuating Title VI appear at 45 C.F.R. § 80.1 *et seq.* (1975).[12] The relevant portions of these regulations, 45 C.F.R. § 80.3(b)(1)(iii) and (v), are set out above in section II of this Memorandum. These specific prohibitions, which cover the treatment of plaintiff in this case, speak in terms of receipt of any "service, financial aid or other benefit under the program." This phrase is explained in § 80.3(b)(4) of the H.E.W. Regulations:

As used in this section, the services, financial aid, or other benefits provided under a program receiving Federal financial assistance shall be deemed to include any service, financial aid, or other benefits *provided in or through a facility provided with the aid of Federal financial assistance.*

Therefore financial aid provided through the Law Center, which has been provided with Federal financial assistance, must be dispensed in accordance with Title VI and the H.E.W. Regulations. Further evidence that Title VI has a broader scope than defendants would attribute to it is found in § 80.5 of the H.E.W. Regulations. This section contains examples of discrimination which are prohibited as a condition for receipt of federal financial assistance. Of particular relevance is example (e), which provides:

(e) In grants to assist in the construction of facilities for the provision of health, educational or welfare services, assurances will be required that services will be provided without discrimination, to the same extent that discrimination would be prohibited as a condition of Federal operating grants for the support of such services. Thus, as a condition of grants for the construction of academic, research, or other facilities at institutions of higher education, assurances will be required that there will be no discrimination in the admission or treatment of students.

---

11. Slip Opinion at p. 15.

12. The relevant portions of these regulations were adopted in 1964, prior to the adoption of

the challenged financial assistance policy. 29 Fed.Reg. 16298 (Dec. 4, 1964).

■ It is the conclusion of the Court, therefore, that by accepting federal financial assistance for the construction of the Law Center, Georgetown and the Law Center were required to refrain from discriminating on the basis of race in providing any service, financial aid or other benefit to its Law Center students.

C. Defendants argue that the 1972 faculty resolution on financial aid policy is part of a bona fide affirmative action program to increase "minority" representation at the Law Center. Defendants point to the H.E.W. Regulations for justification for such affirmative action. Thus, 45 C.F.R. § 80.3(b)(6) provides:

(i) In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination.

(ii) Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin.

Defendants appear to be arguing that reasonable preferences in favor of "minority" persons in order to remedy past discriminatory practices are permissible.

■ As there has been no showing that defendants were guilty of past discrimination, 45 C.F.R. § 80.3(b)(6)(i) is inapplicable. Thus defendants' entire legal defense is grounded on the concept of affirmative action embodied in 45 C.F.R. § 80.3(b)(6)(ii). This regulation, however, does not define affirmative action. Defendants would have the Court conclude that affirmative action is any action which gives a preference to "minorities" regardless of its impact on "non-minorities." While there is authority for the proposition that any affirmative action granting preferences to one race or sex over another is constitutionally infirm, *Cramer v. Virginia Commonwealth University,* Civil Action No. 75–0271–R, 415

F.Supp. 673 (E.D.Va.1976), this Court need not rely on such an extreme position. Affirmative action may be justified provided it does not violate the non-discrimination provisions of Title VI and is administered on a racially *neutral* basis. *See DeFunis v. Odegaard,* 416 U.S. 312, 340, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (Douglas, J., dissenting). Where an administrative procedure is permeated with social and cultural factors (as in a law school's *admission* process), separate treatment for "minorities" may be justified in order to insure that all persons are judged in a racially neutral fashion.

■ But in the instant case, we are concerned with the question of financial need, which, in the final analysis, cuts across racial, cultural, and social lines. There is no justification for saying that a "minority" student with a demonstrated financial need of $2,000 requires more scholarship aid than a "non-minority" student with a demonstrated financial need of $3,000. To take such a position, which the defendants have, is reverse discrimination on the basis of race which cannot be justified by a claim of affirmative action. *See Pennsylvania v. Glickman,* 370 F.Supp. 724, 736 (W.D.Pa.1974); *Anderson v. San Francisco Unified School District,* 357 F.Supp. 248, 254–255 (N.D.Cal.1972); *accord, Kirkland v. New York State Dept. of Correctional Services,* 520 F.2d 420, 427–429 (2d Cir. 1975). While an affirmative action program may be appropriate to ensure that all persons are afforded the same opportunities or are considered for benefits on the same basis, it is not permissible when it allocates a scarce resource (be it jobs, housing, or financial aid) in favor of one race to the detriment of others. *See, e. g., Otero v. New York City Housing,* 344 F.Supp. 737 (S.D.N.Y.1972). Such is the situation in this case. Under no circumstances would the defendants' policy of awarding 60% of scholarship aid to the 11% of the students who are in the favored classification be justifiable under the banner of affirmative action.

D. Defendants argue that assuming plaintiff has been the subject of discrimina-

tion, he must still prove that he was adversely affected by such discrimination. In other words, defendants assert that plaintiff must prove that, *but for* the existence of the Law Center's discriminatory financial aid policy, he would have received a sum in excess of the amount of Direct University Scholarship aid he actually received. Based on the affidavit of defendant Wilmot, defendants argue that plaintiff would have received no Direct University Scholarship aid had the 1972 faculty resolution not been adopted, since all such scholarship funds would have been exhausted at the time plaintiff was admitted to the first-year class.

This "but for" requirement was interposed as a defense in a recent Title VII *sex* discrimination case. In *Cramer v. Virginia Commonwealth University,* Civil Action No. 75–0271–R, 415 F.Supp. 673 (E.D. Va.1976), plaintiff alleged that an affirmative action program under which the defendant university sought actively to recruit females for faculty positions discriminated against him as a male. The defendants admitted the existence of their preferential hiring practices but argued that plaintiff was required also to show that *but for* this preferential treatment he would have been hired by the University instead of the two female applicants who were hired. The court rejected this argument, holding that

> plaintiff's burden does not necessitate a showing that he was one of the two best qualified male applicants. His burden is met upon a showing that he was discriminated against because of his sex. . . If we placed such a degree of proof as defendants herein suggest on all sex and racial discrimination cases we would take decades to litigate them and, more importantly, the right to be free from invidious discrimination would be side tracked and eroded by irrelevant inquiries into qualification rankings.[13]

This Court likewise rejects this *but for* requirement. Plaintiff has been discriminated against because of his race, in violation of Title VI. The Court will not allow such a wrong to escape judicial action because of the complexities of the defendants' admission procedures. While it may be that plaintiff would have received no more scholarship aid had there been no minority financial aid policy, this is a question that goes to the amount of damages to which plaintiff is entitled. On the issue of liability it is clear that plaintiff has been the subject of discrimination by defendants' violation of Title VI.

## CONCLUSION

In light of the facts of this case and especially considering that the defendant Law School has accepted from the United States a substantial grant for the construction of its Law Center, the defendant is obligated to administer its programs in a non-discriminatory manner. This includes the awarding of student aid in the form of scholarships. In this, as in other matters, a balancing test must be applied, for the statute and applicable regulations prohibit discrimination, but the regulations also make provision for affirmative action programs. The ultimate question is whether in order to carry out its affirmative action program the defendant may allocate 60% of its available scholarship funds to 11% of its entering students for the reason that they constitute a "minority." This in the Court's judgment is arbitrary, offends against the non-discrimination provisions of the Act, and is a violation of plaintiff's rights.

---

13. At p. 681.