**COMMONWEALTH OF PENNSYL-
VANIA et al., Plaintiffs,**

v.

**Stephen A. GLICKMAN, President of the
City of Pittsburgh Civil Service
Commission, et al., Defendants.**

**Civ. A. No. 72–937.**

United States District Court,
W. D. Pennsylvania.

Jan. 15, 1974.

Michael Louik, Trevor Edwards, Asst. Attys. Gen., Commonwealth of Pa., Community Advocate Unit, Martha E. Richards, Clencie L. Cotton, John B. Leete, Pittsburgh, Pa., for plaintiffs.

Daniel M. Curtin, Robert B. Smith, Asst. City Solicitors, Ralph Lynch, Jr., City Solicitor, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

Plaintiffs seek to enjoin the defendants from allegedly engaging in unlawful racial discrimination in the recruiting, testing and hiring of applicants for the position of firefighter with the City of Pittsburgh Bureau of Fire. Jurisdiction is properly invoked under 28 U.S.C. § 1343(3) and (4) in that plaintiffs' complaint states a claim for relief under 42 U.S.C. § 1981 and § 1983 and the Fourteenth Amendment to the Constitution.

On June 4–8, 1973, a hearing was held on plaintiffs' request for a preliminary injunction.[1] Before the findings of fact made upon the evidence introduced at that hearing can be summarized, it is necessary that several preliminary matters be dealt with.

## CLASS DETERMINATION

By Order of Court dated June 6, 1973, this Court determined the class of plain-

---

1. The parties agreed during the course of testimony to have the Court consolidate the motions for preliminary and permanent injunction so as to facilitate the granting of meaningful relief. However, on December 19, 1973, plaintiffs again moved for a pre- liminary injunction and a hearing was held on December 21, 1973. Because of the nature of relief granted, both of plaintiffs' motions for preliminary injunction will be denied as moot.

tiffs in this action to "consist of all black persons who presently have applications pending for the position of firefighter with the City of Pittsburgh Bureau of Fire, as well as all black persons who may apply for said position at any time in the future." Because of defendants' continued objections to the maintenance of the class, and in accord with F.R.Civ.P. 23(c)(1), which provides that the Court may alter or amend a class determination Order at any time before the decision on the merits, it will be necessary to review the legal basis for the class determination.

The defendants contend that the named plaintiff, Alvin Bailey, properly represents only a very small class, namely those black persons who share with him the history of dealings with the Bureau of Fire set out below. Bailey himself applied for the position of firefighter with the City in 1966, failed the written test given in that year, reapplied in 1972 and passed the written test, but failed the physical performance test.

The Court would not have been justified in imposing the restrictive limitations defendants suggest in determining the class. In the first place, it must be recognized that the plaintiff Bailey, as a black who alleges injury in fact by virtue of defendants' discriminatory policies, has standing before the court to bring this action. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Assoc. of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Named plaintiff's satisfaction of the standing element, along with a showing that the requirements of Rule 23(a) and 23(b)(2)[2] have been met, assures that the litigation may proceed as a class action. Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir. 1968); Norwalk

CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968). Once these basic requirements have been shown to be satisfied, the Court may then, in its discretion, ascertain the scope and extent of class membership, bearing in mind, in this instance, that subdivision (b)(2) was added to Rule 23 primarily to facilitiate the bringing of civil rights class actions. See Advisory Committee's Note reprinted at 39 F.R.D. 98, 102. Of course, even before the 1966 Amendments (e. g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)), and even without an allegation or finding that a Rule 23(b)(2) class is involved (e. g., Penn v. Stumpf, 308 F. Supp. 1238 (D.C.Cal.1970)), class actions challenging racially motivated discrimination have been permitted. The class action is a vehicle uniquely suited to the resolution of civil rights issues. The Order of June 6, 1973 will not be revised or amended.

## COMMONWEALTH AS PLAINTIFF

Defendants assert that the Commonwealth of Pennsylvania has no standing to maintain this action and must be dismissed. They allege that no injury to the Commonwealth has been demonstrated in this case and that the Commonwealth's participation serves only to further a tendency toward hypothetical lawsuits tried without real parties in interest.

Whatever the merits of the policy considerations defendants forward, they are without a basis in case law for their insistence that the Commonwealth be dismissed as party plaintiff. The Supreme Court, in Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), after outlining the expansion of the concept from its beginnings in medieval England, held that the right to sue as parens patriae includes the

---

2. As developed more fully in Wright & Miller, Federal Practice and Procedure, § 1776, some courts have designated the class in a civil rights class action as proceeding under Rule 23(b)(3), or have even failed to designate which section's requirements have been

satisfied. In accordance with the Advisory Committee's Notes on Rule 23, however, it would seem preferable to find a Rule 23(b)(2) class where racial discrimination in employment is alleged.

right to recover for damages to the state's quasi-sovereign interests—defined generally as the health and welfare of its citizens. Racially discriminatory employment practices would unquestionably impair the welfare of Pennsylvania's citizenry. In accord with Com. ex rel. Rafferty v. Phila. Psychiatric Center, 356 F.Supp. 500 (E.D.Pa.1973), I hold that the Commonwealth of Pennsylvania has standing in this case under the doctrine of parens patriae.

### THE CITY AS DEFENDANT

■ In City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), the Supreme Court held that a municipal corporation is not a "person" within the meaning of 42 U.S.C. § 1983 when equitable relief is sought under that statute. Earlier, it had been held in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) that a municipal corporation was not a "person" under the statute when damages were sought under Section 1983. Therefore, as is conceded by plaintiffs, their Section 1983 cause of action against the City of Pittsburgh must be dismissed.

Plaintiffs contend, however, that the city must remain a party to the suit because relief is also sought under 42 U.S.C. § 1981. While it is true that private racial discrimination in employment by corporations and unions is actionable under Section 1981, Young v. ITT, 438 F.2d 757 (3d Cir. 1971), in the context of this case it is unnecessary to decide whether a municipal corporation can be liable under Section 1981, or alternatively whether federal question jurisdiction exists over the city under the Fourteenth Amendment. The City of Pittsburgh, therefore, will be dismissed as a party defendant.

Little or no prejudice can result to the plaintiffs by virtue of the city's dismissal because the various city employees who exercise responsibility over the testing and hiring of Pittsburgh firefighters have been named as defendants in this action. The granting of equitable relief will be just as effective applied to the defendant city employees, as it would if the city per se were retained. Neither Kenosha nor Monroe preclude holding a municipal corporation liable under Sections 1983 or 1981 by means of an action against its employees. Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973).

### STATUTE OF LIMITATIONS

■ Since the Civil Rights Act neither contains nor refers to a provision limiting the time within which an action may be brought, the applicable statute of limitations for Section 1983 actions is that which would be applied had similar relief been sought in state court, the most nearly analogous state statute of limitations. Henig v. Odorioso, 385 F.2d 491, 493 (3d Cir. 1967), cert. denied, 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1969). It has been held that the Pennsylvania two-year statute of limitations for personal injuries is applicable to civil rights actions. Gozdanovic v. Civil Service Commission, 361 F.Supp. 504 (W.D.Pa.1973).

■ The majority of cases which have dealt with employment discrimination problems have devoted little attention to the problem of the statute of limitations to be applied. The question is seemingly discussed most often, for example, only when the back pay award is at issue. The unusual circumstances of this case, however, render the problem of the statute of limitations of some importance. Because the named plaintiff, Alvin Bailey, failed the written examination given in 1966 but passed the 1972 examination (only to fail the physical examination, which employment requirement is not at issue in this case), this case would have to be dismissed as barred by the statute, if a strict two-year statute of limitations were to be applied, or if Bailey were the only black applicant for the position in 1972 who was before the Court.

But militating against dismissal is the concept of continuing injury, which has traditionally served to limit the applica-

tion statutes of limitations. As explained in 51 Am.Jur.2d § 135, p. 705:

"As another qualification of the general rule, in case the wrongful act is continuous or repeated, so that separate and successive actions may be instituted for the damages as they accrue, the statute of limitations does not run, as to such actions for subsequently accruing damages, from the date when the first wrong was suffered, but only from the successive dates."

Although application of the concept of continuing wrong to the case *sub judice* requires one to visualize the abstraction of defendants' allegedly discriminatory conduct as being visited upon named plaintiff and the other blacks in the class over a period from 1966 until the filing of the complaint in this action, this is no more difficult an example of abstract conceptualization than is often required in legal reasoning. No more difficult, for example, than that required in applying the personal injury statute of limitations to Section 1983 civil rights actions in the first place.

To deny application of the two-year statute of limitations in a Section 1983 employment discrimination case on the basis of continuing injury finds support in the recent decision of Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.C.Md.1973); aff'd sub nom. Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973). In *Harper,* the District Court (Young, J.), facing a fact situation similar to the one in this case, held that defendants would not be heard to claim limitations since the discrimina-

tory treatment complained of continued into the present. *Id.* at 1195–1196.

■ Furthermore, it must be remembered in considering this problem that the named plaintiff, the NAACP,[3] and the Commonwealth represent a class of black persons which includes those blacks who failed the 1972 written examination. Looked at from that point of view, it becomes clear that testimony as to those allegedly discriminatory acts of the defendants which took place prior to the two-year statutory period is admissible on a purely evidentiary basis-relevance.

■ Thus, testimony regarding past employment practices of the Bureau of Fire has been admitted and considered by this Court in order to examine the present employment situation in the Pittsburgh Bureau of Fire. It is the present situation, presumptively the result, at least in part, of past discrimination, which is the focus of plaintiffs' action.[4]

## DISCRIMINATION IN THE PITTS-BURGH BUREAU OF FIRE

The preliminary matters having been disposed of, we may now turn to the merits of the controversy.

While approximately 20% of the population of the City of Pittsburgh is made up of blacks, at present only between 3% and 4% of the Pittsburgh Bureau of Fire is black. The city's total population stands at about half a million persons today, of which about 100,000 are black. At the time this action was commenced, 30 of the Bureau of Fire's 1,000 employees were black, or 3%. By

3. It is well established that the NAACP has standing to assert the rights of its members. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972). In this case, NAACP members are present and future applicants for the position of firefighter and, thus, members of the class. See Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1971).

4. Another issue is raised which may be summarily discussed and disposed of—the neces-

sity of convening a three-judge court pursuant to 28 U.S.C. § 2281 in order to consider and grant the relief plaintiffs seek. The convening of a three-judge court is not necessary in this instance because the allegedly unconstitutional result reached under the civil service statutory requirements is what is being attacked here, rather than the Act itself. *See* Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941), Ex Parte Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249 (1940).

the time of the hearing held in June of 1973, the Bureau of Fire had 1,039 members of whom 41, or 3.9%, were black.

Over the past 36 years, the period during which hiring for the Bureau of Fire has been under the aegis of the Civil Service Commission, the number and percentage of blacks in the Bureau has remained relatively constant. There has, however, apparently been some significant change in the treatment accorded black firefighters as a group over that period, corresponding to the different treatment accorded blacks on a nationwide basis. According to the testimony of Chief Thomas Kenelly, longtime member of the Bureau, present Chief of the City of Pittsburgh Bureau of Fire and one of the defendants in this case, during the early 1950's the two all-black firehouses which served the city's black districts were disbanded and the black firefighters who served in those firehouses were reassigned throughout the city. This shift, of course, paralleled the transition from "separate but equal" to integrated facilities which took place in most of this country's institutions, including the United States Army, during that period.

But plaintiffs contend, and there is evidence to support their position, that this changeover marked the beginning of what turned out to be worsening treatment for Pittsburgh blacks as far as employment with the Bureau of Fire was concerned. Black employment prior to and during the separate but equal era was apparently marked by the unwritten but effective rule that when one black left the Bureau's employ, only another black could be hired to replace him. The political patronage system, under which this method of rough proportionality in black representation had been maintained, continued to function effectively up until the early 1950's well past the time when civil service requirements had been imposed. This system can be seen to have developed an informal racial hiring quota of minimum flexibility as to Bureau of Fire employment. As such, this system's resulting effectiveness in according blacks some representation in the fire department, coupled with its inevitable concomitant discrimination against non-blacks, poses a dilemma which requires careful deliberation in resolving upon curative measures. See pages 18–26, *infra*.

The fact remains that in 1950, when Pittsburgh's total population was approximately 675,000, 12% of its citizens and roughly 3% of its firefighters were black.[5] In 1960, about 16% of the city's population and 3% of its firefighters were black. In 1973, the black percentage of the city's population had risen to 20%, and yet still only 3.9% of its firefighters were black.

When this 23-year disparity between black population and black representation on the city Bureau of Fire is taken together with the fact that in 1972, the year that the most recent eligibility examination was conducted by defendants, 70% of the white applicants taking the written examination passed, while only 45.2% of the black applicants passed, a prima facie case of de facto discrimination is demonstrated.[6]

5. Throughout this Opinion, as is the custom of the Court, factual statements shall be taken as findings of fact, though not formally denominated as such. See F.R.Civ.P. 52.

6. Because the finding of de facto discrimination has been made on the basis of test results, it is unnecessary to consider the other grounds which plaintiffs urge as having a discriminatory effect—the requirement of a high school or equivalent degree before application, and the disqualification from employment of anyone convicted of a felony or misdemeanor, unless pardoned. This latter requirement is particularly troublesome in that plaintiffs argue that since more blacks than whites have been convicted of certain crimes, they are necessarily discriminated against by the ban. But since the Second Class City Charter Act (Act of March 7, 1901, 53 P.S. § 22101 et seq.) makes mandatory the bar on employment of such persons, to hold that a disqualification based upon conviction of certain crimes has a racially discriminatory impact would require the Court to rewrite, and possibly administer,

Some federal courts, having found a disparity between the percentage of a minority group in the general population and that group's percentage representation in a particular job or classification, have termed that disparity to be a prima facie showing of discrimination. E.g., Carter v. Gallagher, 337 F.Supp. 626, D. C., modf'd & aff'd 452 F.2d 315, 323 (8th Cir. 1971), cert. denied 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Western Addition Community Organization v. Alioto, (hereinafter W. A.C.O.), 330 F.Supp. 536, 539 (N.D.Cal. 1971). Other courts have held that such a disparity equals some supporting evidence for a finding of discrimination. E. g., Bridgeport Guardians, Inc. v. Bridgeport Civil Service Comm., 482 F. 2d 1333, 1335 (2d Cir. 1973); Castro v. Beecher, 334 F.Supp. 930, 935–936 (D. Mass.1971), modf'd & aff'd 459 F.2d 725 (1st Cir. 1972). Judge Friendly of the Second Circuit Court of Appeals favors use of the phrase "racially disproportionate impact" in order to avoid the "pejorative connotation of 'discrimination' or even 'de facto discrimination'." Vulcan Society v. Civil Service Comm., 490 F.2d 387, n. 4 (2d Cir. 1973).

If a finding that conduct amounts to a prima facie showing of de facto discrimination carries with it a pejorative connotation, it is unavoidable. A prima facie demonstration of any concept means only that a proposition has been demonstrated to be true in the absence of rebuttal. A finding of prima facie discrimination must be understood to be merely one procedural step in a more elaborate process, a useful device in cases where the difficulties of proof of whether or not there has been discrimination and whether or not it has been intentional necessitate the use of a perhaps imperfect semantic tool. Of course, care must be taken that too much is not read into the words used. But ultimately, meaning, like beauty, is in the eye of the beholder and if semantic precision will not forestall misunderstanding, nothing will.

The disparities between black population and black representation in the Bureau of Fire and between the black pass rate and the pass rate for white applicants demonstrate only a prima facie showing of de facto discrimination. They do not prove a violation of the law. The law does not require that community employment, either public or private, reflect community racial percentages. A showing of de facto discrimination, the prima facie case explained above, in turn shifts to the defendants the burden of justifying the use of those hiring procedures which have been shown to have had a discriminatory impact. Commonwealth of Pa. v. O'Neill, 348 F.Supp. 1084 (E.D.Pa. 1972); rev'd 473 F.2d 1029, 3 Cir.; aff'd in part and rev'd in part on rehearing en banc, 473 F.2d 1029 (3d Cir. 1973); Carter v. Gallagher, *supra.* This shift of the burden of going forward with the evidence is nothing more or less than the sole effect of a demonstration of a prima facie case of de facto discrimination. It carries with it no implication whatsoever that the discrimination was in any way intentional or malevolent.[7]

the Civil Service Act which governs the employment of firefighters. Obvious dangers would present themselves if convicted burglars or rapists, for example, were given access to the city's homes by virtue of their employment as firefighters. On the other hand, while a convicted forger might not be suited for employment as a bank teller, to disqualify such a person from holding a position as a firefighter is not necessarily a reasonable employment policy. Meanwhile, this Court has neither the inclination nor the obligation to attempt to itemize which crimes bear a reasonable relation to job performance and which do not. That is the task of either the defendants under the statutes which govern their operations, or of the legislature in revising those statutory controls.

7. There need be no finding that the discrimination was intentional, deliberate or malevolent because such considerations are irrelevant in employment discrimination cases. Erie Human Relations Comm. v. Tullio, 360 F.Supp. 628, 630 (W.D.Pa.1973); cf., Louisiana v. United States, 380 U.S. 145, 85 S.

■■■■■ The extent of the burden of going forward with the evidence thrust upon the defendants depends, of course, upon the standard of justification invoked by the court.[8] The standard applicable to the racial classifications in public and private employment cases is job-relatedness. The question in such a case is whether the employment practice which operates to exclude minorities can be shown to be substantially related to job performance. Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[9] The burden is on the defendants to demonstrate job-relatedness, not by showing that the employer could rationally believe his examination to have been job-related but by a clear and convincing demonstration to the Court of job-relatedness through the use of persuasive factual evidence, Bridgeport Guardians v. Bridgeport Civil Service Comm., *supra.*

Courts which have confronted challenges to public employment examinations have almost uniformly[10] turned to the EEOC Guidelines found at 29 C.F.R. § 1607.1 et seq. as an aid in determining the criteria to be utilized in evaluating job-relatedness. The Guidelines permit the use of those examinations which have been subjected to either predictive validation or content validation, prefera-

bly the former. In the jargon of psychometrics, predictive validation involves comparing relative performance on a given test with subsequent job performance. As can readily be seen, the most important ingredient in a predictive validation study is time, for often a lengthy period must pass before a group's job performance can be measured.

Content validiation of a test, on the other hand, requires that an analysis of the job involved be undertaken to determine what characteristics are essential for the adequate performance of that job. The job analysis is then followed by the formulation of a test which accurately reflects the presence or absence of these necessary qualities. The EEOC Guidelines permit content validation of an examination when predictive validation is not feasible. It would seem that most courts, being almost invariably under time pressure to arrive at a resolution of the case before them, will find content validation to be the only feasible method. Apparently no test designed for firefighters, for instance, has yet been successfully subjected to predictive validation.

■■■■■ Defendants in this case have failed to sustain their burden of

Ct. 817, 13 L.Ed.2d 709 (1965). It is simply not necessary that there even be the suggestion that the onus of discrimination be cast upon defendants for their personal responsibility in hiring for the Bureau. This sort of case is, by its very nature, a depersonalized policy vehicle; that is, a convenient and workable means of achieving socially desirable objectives with a minimum of disruption and animosity. Thus, any attempt to sensationalize this Court's findings into anything more than they are is without basis in reality.

8. Because these cases involving racial discrimination in public or private employment are *sui generis*, neither the compelling state interest test nor the rational relationship test, often invoked when the defendants have applied racial criteria, is appropriate. NAACP v. Civil Service Comm., S.F., (N.D. Cal.1973) 6 EPD ¶ 8956.

9. In accord with the practically uniform practice of the many courts which have

faced this sort of problem, which cases are cited throughout the text, especially Harper v. Mayor, *supra*, 359 F.Supp. at 1196, n. 13, I find that the standard applied in *Griggs*, a suit brought under Title VII of the Civil Rights Act of 1964, is appropriate for application in an employment discrimination suit brought under 42 U.S.C. § 1981 and § 1983 and the Fourteenth Amendment. See what may be a suggestion to the contrary (the issue is said to pose a "difficult question") in the three-judge panel decision in Commonwealth of Pa. v. O'Neill, *supra*. Cf., McConnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

10. E. g., Vulcan Soc. v. Civil Service Comm., *supra*; NAACP v. Civil Service Comm., S. F., *supra*; W.A.C.O. v. Alioto, *supra*; Castro v. Beecher, *supra*; Carter v. Gallagher, *supra*; Bridgeport Guardians v. Bridgeport Civil Service Comm., *supra*.

proving that the 1972 firefighter's examination was job-related[11] and indeed have failed to demonstrate that their examination can lay claim to any sort of validity.[12] No attempt at predictive validation of the 1972 examination has been made by defendants. Defendants' experts, Dr. James F. Horgan and Dr. William P. Sullivan, did testify however that an effort had been made toward content validation of the 1972 test. Toward that end, a job analysis of a firefighter's day to day work was conducted. Defendants' experts interviewed Fire Bureau officials and personnel and conducted on-the-job observations of Bureau personnel at work. In addition, Dr. Horgan and Dr. Sullivan obtained and compared the firefighter job analyses done for other major cities and testified that they found those results and their own to be substantially the same.

In undertaking a job analysis,[13] defendants' experts completed only half of the task of content validation. The second, and most important, step in content validation is the construction and utilization of an examination which tests for the presence of those factors essential to satisfactory job performance. The 1972 examination, since it was not constructed in response to a job analysis and since it contained so much extraneous and inappropriate material, certainly does not qualify as such an examination.

The expert testimony from both sides established that a firefighter must have the ability to perform certain mathematical computations like fractions, percentages and multiplication. But the 1972 examination contained problems involving cubed roots, square roots and the square root of fractions which neither the Court, the Court's staff, nor learned counsel were able to perform. Moreover, although the job of firefighter would seem to require only minimal reading skills, the reading level required for the 1972 examination was that of the ninth to eleventh grade. The test's minimum requirements were geared to the level required to comprehend the training manual used in the Bureau's Fire Academy for new recruits. In other words, although evidence was introduced that the material in the manual was not of such complexity as to require a relatively high level of reading skill in order to comprehend it, the Bureau's choice was to raise the requirements of the test, rather than simplify the language in the manual. Thus, as to both its verbal and mathematical sections, the 1972 examination was not job-related and indeed seemingly demanded overqualification, a characteristic which is counterproductive of future job satisfaction.

This Court has no desire "to fall into [the] error [of] umpiring a battle of experts who speak a language it does not

11. Evidence as to job-relatedness and validation was heard only as to the most recent, the 1972 examination.

12. A great deal of testimony was taken as to whether the 1972 examination was culturally biased toward blacks. Cultural bias in an examination is shown when any subgroup of the population scores lower on the examination than the population as a whole. Job-relatedness, on the other hand, is shown when a substantial correlation between test performance and job performance is demonstrated. Thus, a test for a given job could be completely validated as to its job-relatedness and yet be of such a nature that no black person could reasonably expect to pass it. Whether the black subgroup's failure to achieve success on the examination is due to lack of education, social deprivation, lack of motivation or innate absence of ability can be of no concern to the Court in the exam-

ple given. The only standard by which the Court is governed in judging the examination is job-relatedness. It is conceivable, of course, that the two factors might coincide, that is, for an examination to be constructed which is both job-related and culturally unbiased. Insofar as that is possible, it is an ideal for which all employers who utilize entrance level examination should strive. But that ideal cannot be the goal of the Court in an employment discrimination case. Therefore, because of this Court's doubts as to whether an examination can be constructed which is not culturally biased, and because, more importantly, the legal standard is job-relatedness, not cultural bias, no finding on the issue will be made.

13. Although defendants' experts testified that a job analysis was done, no such job analysis exists in written form, or at least none was presented to the Court.

fully understand." Vulcan Soc. v. Civil Service Comm., *supra,* 490 at 396. The examples set out above are meant to be illustrative, not exhaustive. This Court has no special expertise in psychological testing, just as it has no claim to superior knowledge in the fields, for instance, of patent law or accounting. The Court's function, when faced with problems in the aforementioned areas, is to make a reasoned, impartial decision on the basis of the evidence presented, using the precedent of previous case law as a guide. This is what has been done here.

The test to be applied here is simply that an examination must be "shown to bear a demonstrable relationship to successful performance of the jobs for which it was used." Griggs v. Duke Power Co., *supra,* 401 U.S. at 431, 91 S. Ct. at 853. The defendants have failed to make such a demonstration as to the 1972 examination.[14] Even assuming a complete and accurate job analysis was performed, the 1972 examination was not constructed or administered so as to test for those factors necessary to job performance. The 1972 test was not validated.[15]

### REMEDY

 We start from the premise that this District Court "sitting as a court of equity, has wide power and discretion to fashion its decree not only to prohibit present discrimination, but to eradicate the effects of past discriminatory practices." Bridgeport Guardians v. Bridgeport Civil Service Comm., *supra,* 482 F. 2d at 1340. Beginning with Carter v. Gallagher, *supra,* in 1971, numerous courts have held that their equitable powers include the authority to impose racially-oriented hiring quotas upon public agencies in order to erase all vestige of past discriminatory conduct and to prevent the repetition of any such conduct. See, for example, the following cases involving municipal police departments, Bridgeport Guardians v. Bridgeport Civil Service Comm., *supra;* Comm. of Pa. v. O'Neill, *supra;* Castro v. Beecher, *supra;* Erie Human Relations Comm. v. Tullio, 360 F.Supp. 628 (W.D. Pa.1973); NAACP v. Allen, 340 F.Supp. 703 (M.D.Ala.1972) (state police); Shield Club v. City of Cleveland, 370 F. Supp. 251 (N.D.Ohio 1972) as well as those cases which involved municipal fire departments: Carter v. Gallagher, *supra;* NAACP v. Civil Service Comm., S.F., *supra;* Vulcan Soc. v. Civil Service Comm., *supra;* Coffey v. Braddy, 372 F. Supp. 116 (M.D.Fla.1971); Davis v. County of Los Angeles (C.D.Cal.1973); Arnold v. Ballard (N.D.Ohio 1973).

Indeed, in Commonwealth of Pa. v. Sebastian, 368 F.Supp. 854 (W.D.Pa.1972) (Teitelbaum, J.), 5 EPD ¶ 8558, aff'd per curiam, 480 F.2d 917 (3d Cir. 1973), this Court imposed a racial hiring quota. In *Sebastian,* the Penn Hills police department was preliminarily enjoined from additional hiring, except on the basis ordered: that the township be permitted to hire six additional policemen, at least one of whom had to be black, thereafter for one black to be hired for every white applicant hired, until three black policemen were on the force.

But the imposition of a racial hiring quota in *Sebastian* was compelled by the presence of two factors not present in this case. First, and most important, whereas the evidence in this case shows merely a disparity between black percentage of population and black representation on the Bureau of Fire, the evidence in *Sebastian* showed that no blacks were, at the time of trial, or ever had been employed by defendant township, although blacks comprised between 4.5% and 7.4% of the community's resi-

14. As stated above, evidence was not introduced as to the validity in terms of job-relatedness, of previous examinations. In the absence of contrary evidence, they must be assumed to have contributed to the creation of the de facto discrimination which the Court found in the first part of this analysis.

15. That the examination was not validated does not mean, of course, that those persons who failed it, black or white, are in fact qualified for the position of firefighter.

dents over a twenty-year period. The importance to the Court of this distinction between zero black representation and a mere disproportion between black population and black representation on a municipal force *does not* amount to a holding that a certain degree of racial discrimination in public employment is *de minimis*. The standards to be applied in arriving at a showing of prima facie de facto discrimination, and the significance of such a finding, have been clearly set out earlier in this Opinion. Rather, the differentiation between zero representation and a disparity in representation goes only to the remedy the Court must fashion in its discretion. A case of this sort inevitably involves the delicate balancing of the most sensitive individual and societal needs throughout. In the remedy phase of a case such as this, the differentiation set out above has an obvious bearing on the urgency and necessity for imposing quota hiring to more quickly remedy the effects of past discrimination.

The second factor which leads the Court to distinguish *Sebastian* in terms of remedy is the fact that *Sebastian* involved a municipal police force, whereas this case involves a municipal fire department. This factor, like the differentiation between zero representation and a disparity in representation, goes not to the substantive findings which are the first consideration in a public employment discrimination case, but only to the urgency and necessity for imposing the drastic remedy of a racial hiring quota.

This second factor is based upon the degree of public interaction inherent in the type of public employment under examination. In any racially integrated community, the importance of having at least some degree of minority representation on the police force cannot be underemphasized. Minority representation on the police force is vitally important, both in terms of the self-esteem of minority group members, and in terms of the manner and degree of compliance accorded the police in their peace-keeping duties. It might be said that in an integrated community, the visibility of blacks on the police force is one of the keys to the maintenance of social stability. The same cannot be said of a municipal fire department, for its employees do not perform in the public arena as frequently and do not attempt to impose the sanctions and controls of the state upon the public as frequently. Needless to say, however, the second factor must be taken in conjunction with the first, and a court faced with a total absence of black firefighters in a municipal fire department might well see fit to require a racial hiring quota to remedy the situation.

Most of the courts who have seen to impose quotas in employment discrimination cases have followed the reasoning employed in Carter v. Gallagher, *supra,* one of the first district court or appellate court decisions in the area of public employment discrimination. The cases which follow *Carter* in imposing a quota, for example, NAACP v. Civil Service Comm., S.F., *supra,* do so in reliance on *Carter's* basic assumption that the Supreme Court's language in Swann v. Charlotte-Mecklenburg School District, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970),[16] wherein the Court approved a racial quota as a remedy for school segregation, renders by analogy the imposition of racial quotas in public employment cases constitutionally permissible.[17] The analogy is inapposite. The school

---

16. E. g., a "desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the conditions that offends the Constitution." 402 U.S. at 15–16, 91 S.Ct. at 1276.

17. Viz., "It has now been established by the Supreme Court that the use of mathematical ratios as 'a starting point in the process of shaping a remedy' is not unconstitutional and is 'within the equitable remedial discretion of the District Court'." Carter v. Gallagher, 452 F.2d 315, 331 (8th Cir. 1972), citing Swann v. Charlotte-Mecklenburg, 402 U.S. at 25, 91 S.Ct. 1267, 28 L.Ed.2d 554.

integration cases are not precedent for compelling public employers to hire on a racial basis.[18]

 In the first place, such a conclusion is at odds with the meaning and intent of both the Fourteenth Amendment and the Civil Rights Act of 1964. Title VII of the Civil Rights Act clearly prohibits all hiring on the basis of race. 42 U.S.C. 2000e–2(j) (1964). Under the Act, no minority group member may be discriminated against *or hired* on the basis of race. Moreover, unless the Fourteenth Amendment is applicable only to blacks, a highly questionable proposition on its face, it too serves to mandate colorblindness in hiring.[19] Insofar as racial preference hiring quotas deny employment to qualified persons of other races, they compel reverse discrimination.[20] If *any* racial classification is constitutionally objectionable in and of itself, then no governmental purpose, even the eradication of racial discrimination and its effects, can justify the imposition of racially oriented hiring quotas.[21]

 The weighty and devilishly paradoxical considerations involved in the question of constitutionality need not be decided here. It is not necessary, indeed it would be presumptuous, for this Court to rule that employment quotas are unconstitutional in that they compel reverse discrimination. The question is not before the Court. But considerations of constitutionality, along with other troublesome considerations, lead this Court to reject the remedy of racially-oriented hiring preferences in this case.

Putting aside questions of constitutionality, two considerations provide a strong rationale for avoiding the imposition of a racial hiring quota. First, the Court is not unmindful of the possibility that what is begun as a minimum quota today can easily become a maximum quota in the near future. Historically, the *numerus clausus* has been a frequently used tool to effectuate discrimination. This Court will not contribute to that process.

Second is the fact that, in the final analysis, responsibility for eradicating racial discrimination in the Pittsburgh Bureau of Fire rests upon the defendants alone. The interference of a federal court in their hiring practices raises questions not only of comity, but of practicality, for this Court, like any other, is without the facilities or the personnel to oversee the operation of a hiring system, even if it were to maintain continuing jurisdiction, which it will not do. The defendants have made earnest, good faith efforts to recruit blacks for the Bureau of Fire. If, as we were told by one of plaintiffs' witnesses, the problem is essentially one of reeducation so that blacks perceive the Bureau of Fire as an organization which will treat them fairly in its employment practices, then the defendants have already made significant strides toward the goal of. equal treatment. The maintenance of continuing jurisdiction is unnecessary because the Court has every reason to believe that the defendants' bona fide efforts to recruit and train more blacks will not slacken.

Perhaps having taken into account some of the considerations discussed

18. See Harper v. Mayor, 359 F.Supp. at 1214; Gazza, Carter v. Gallagher: From Benign Classification to Reverse Discrimination, 34 U.Pitt.L.Rev. 130 (1972); and Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1115, for further reasoning in support of this proposition.

19. See Kaplan, Equal Justice in an Unequal World, 61 Nw.U.L.Rev. 363, 382 (1966).

20. Cf., McLaughlin v. Florida, 379 U.S. 184, 198, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (Stewart & Douglas, JJ., concurring).

21. See Anderson v. San Francisco Unified School District, 357 F.Supp. 248 (N.D.Cal. 1972), wherein the Court held that preferential treatment of minority employees on the basis of race constituted reverse discrimination in violation of the Civil Rights Act against "other white" employees.

above, several courts since Carter v. Gallagher have refused to impose racial quotas, while at the same time approving and ordering other affirmative measures to eliminate the present effects of past discrimination. Harper v. Mayor, *supra;* Castro v. Beecher, *supra;* Chance v. Bd. of Examiners, 330 F. Supp. 203 (S.D.N.Y.1971), aff'd 458 F. 2d 1167 (2d Cir. 1971); Arrington v. Mass. Bay Transit Auth., 306 F.Supp. 1355 (D.Mass.1969); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968) (private employment). It is that course which will be followed here.

It must, however, be made clear that the fact that at this stage of the proceedings the Court has rejected the option of imposing a racial hiring quota does not mean that it is foreclosed from instituting such a remedy in the future. A useful lesson in this regard is presented in the case of W.A.C.O. v. Alioto, *supra,* wherein the District Court on three separate occasions [22] refrained from imposing a quota, each time calling only for a non-discriminatory, job-related examination to be submitted to the court for approval. Three times the defendants failed to submit such an examination, until finally the district court in its most recent decision had no alternative but to impose a racial hiring preference. Should defendants in this case fail to comply with the Order which accompanies this Opinion, in other words, should we find ourselves faced with the stubborn and dilatory non-compliance which faced the court in *W.A.C.O.*, this Court will not hesitate to reconsider its remedy and impose a racial hiring quota. As matters stand, however, this Court has confidence that the defendants will proceed with dispatch to implement the program the Order sets out for eliminating racial discrimination in the Pittsburgh Bureau of Fire.

## ORDER

And now, to wit, this 15th day of January, 1974, in accordance with the foregoing Opinion in the above-captioned case, it is hereby ordered as follows:

1. Defendants, their successors and all individuals acting in concert with them shall conduct further entrance level admission examinations for the position of firefighter with the City of Pittsburgh Bureau of Fire only if, within six months of the date of this Order, either:

(a) The defendants, their successors and all persons acting in concert with them take all necessary steps with all reasonable diligence to demonstrate that the 1972 examination is substantially related to job performance. That is, the defendants, their successors and all individuals acting in concert with them shall take necessary steps with all reasonable diligence to subject the 1972 examination to either content validation or predictive validation; or

(b) The defendants, their successors and all individuals acting in concert with them formulate a new and validated examination which is job-related and non-discriminatory in accord with the standards set out in 1(a) above.

(c) The defendants, their successors and all individuals acting in concert with them shall also take all necessary steps with all reasonable diligence to insure that the examination which has been validated in accord with 1(a) or 1(b) above be, insofar as it is possible, free of cultural bias towards blacks.

(d) Any showing that the defendants, their successors and all individuals acting in concert with them have failed to comply with 1(a) or 1(b) above may be made to this Court upon application of interested parties, with request for further relief as may be appropriate.

2. The defendants, their successors and all individuals acting in concert with them shall also take all necessary steps with all reasonable diligence to recruit eligible blacks to take the eligibility examination validated in accord with 1(a) and 1(b) above, such steps to be in accord with, but not limited by, those re-

22. 330 F.Supp. 536 (1968 test); 340 F.Supp. 1351 (1971 test); and 360 F.Supp. 733 (1973 test).

cruitment efforts taken with regard to the 1972 examination.

3. The defendants, their successors and all individuals acting in concert with them, while they are taking all steps necessary to the completion of a validated examination, may undertake further hiring from the 1972 eligibility list, except that such hiring shall not be conducted on a basis other than actual need.

4. Plaintiffs' motions for preliminary and permanent injunction are hereby denied as moot, in light of the relief ordered above.